**Ronald Y. CHUANG and Linda Chuang, Plaintiffs–Appellants,**

v.

**UNIVERSITY OF CALIFORNIA DAVIS, BOARD OF TRUSTEES; and Fitz–Roy Curry, Defendants–Appellees.**

**No. 99–15036.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 2000.

Filed Aug. 30, 2000.

Bradley G. Booth, Booth & Finch, Sacramento, California, for the plaintiffs-appellants.

Dennis C. Huie, Porter, Scott, Weiberg & Delehant, Sacramento, California, for the defendants-appellees.

Before: POLITZ,[1] REINHARDT, HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

Dr. Ronald Y. Chuang and Dr. Linda Chuang contend that officials at the University of California, Davis ("Davis") discriminated against them on the basis of their race (Asian) and national origin (Chinese), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*[2] The Chuangs allege that they suffered discrimination as a result of: (1) Davis's failure and refusal to provide Dr. Ronald Chuang with a promised tenure position; (2) Davis's forcible relocation of the Chuangs' laboratory during an ongoing research program sponsored by the National Institute of Health ("NIH"); and (3) Davis's failure to respond to Dr. Ronald Chuang's complaints regarding the misappropriation of some of his research funds.

---

1. The Honorable Henry A. Politz, Senior United States Circuit Judge for the Fifth Circuit Court of Appeals, sitting by designation.

2. Plaintiffs voluntarily dismissed Dr. Fitz–Roy Curry as a defendant below.

The district court granted Davis summary judgment on all three claims. We reverse on the first two and remand for further proceedings.

## I. BACKGROUND [3]

Dr. Ronald Chuang is a microbiologist with a worldwide reputation in his area of expertise. He has conducted important research on the interaction between drug abuse and AIDS, including a seminal study on the effect of morphine on the simian immunodeficiency virus, an important model for AIDS research. He has published his findings in prestigious scientific journals. His research has been continuously supported by grants from the National Institute of Health (NIH). In 1996, when many of the events in this case transpired, his research program was being funded by an extraordinary $1.7 million grant from the NIH and other external sources.

The School of Medicine at Davis is divided into two parts: Clinical and Basic Sciences. The Basic Sciences division consists of five departments: pharmacology, biological chemistry, physiology, cell biology and human anatomy, and medical microbiology.

In 1982, the School of Medicine hired Dr. Chuang as an assistant professor of pharmacology and Dr. Linda Chuang, his wife, as an assistant research pharmacologist.[4] The Chuangs have long collaborated on various research programs. The Chuangs joined the pharmacology department at Davis because they had enjoyed their graduate school experience there and wanted to contribute to the university's educational mission. In choosing Davis, Dr. Chuang turned down an offer for a tenure-track position at the leading pharmacology department in the country, at Yale University.

**3.** Because the plaintiffs appeal from an order granting Davis summary judgment, we set forth the relevant facts in the light most favorable to them. Some of these facts are disputed by Davis.

## A. Denial of FTE Position

When Dr. Chuang joined Davis, he was appointed as an assistant "in-residence" professor. Professors in residence are responsible for funding most of their salaries and research through outside grants. By contrast, full-time-equivalent (FTE) professors—i.e., tenured faculty—have their salaries funded directly by Davis. When an FTE faculty member in a department retires or resigns, the FTE position is generally returned to the department to be reallocated to someone else. Dr. Chuang, the only full-time faculty member in the pharmacology department who is not Caucasian, is also the only one without an FTE.

Shortly after Dr. Chuang joined the department, Dr. Larry Stark, then the department chairman, supported Dr. Chuang for a five-year NIH Research Career Development Award (RCDA), with the understanding that if the prestigious award were granted, Dr. Chuang would receive an FTE position upon its completion. Dr. Chuang received the award, completed it in 1989, but never received an FTE.

In a letter dated April 26, 1988, Chairman Stark informed Dr. Chuang that School of Medicine Dean Hibbard Williams wanted to keep him on the faculty, but that no FTE was available at the time and Davis could not provide him one until a resignation or retirement occurred. In a memorandum dated April 1988, Chairman Stark told an assistant dean that "the School has committed itself to finding [Dr. Chuang] a permanent FTE position in the Department." The memorandum described Dr. Chuang's promotions within the department to the level of associate professor and concluded that in light of "recent court decisions ... these facts also argue strongly for planning an FTE position for Dr. Chuang."

**4.** The allegations and claims in this case relate primarily to Dr. Ronald Chuang. For purposes of clarity, we herein refer to him as "Dr. Chuang" and his wife as "Dr. Linda Chuang."

There have been five retirements in the pharmacology department since 1989. Nevertheless, Dr. Chuang has not received an FTE.

The Executive Committee is a supervisory and policymaking body of the Davis School of Medicine. At a meeting of this committee in 1989, Professor Wallace Winters asked about a Chinese–American professor (not Dr. Chuang) whom the faculty of the pharmacology department had previously and unanimously asked the administration to pursue as a candidate for department chairman. The administration had never contacted this candidate, and Dean Williams had not responded to the faculty's request. According to Professor Winters, Dr. Carroll Cross, sitting next to the dean, remarked that "two Chinks" in the department were more than enough; in response, Dean Williams laughed.

In 1989 and 1990, Davis hired two Caucasian professors as FTEs in the pharmacology department. The second of these two professors, Dr. Michael Hanley, a male Caucasian with no active NIH grants, was hired as a "Targets of Opportunity for Diversity" appointment. The "Targets of Opportunity for Diversity" program was designed by the University of California to recruit minority and women faculty. It provided a special exemption by which a department could forgo the regular full candidate search for an open position.[5] Through these hires, the already overwhelmingly white pharmacology department became more so.

Several more FTEs became available to Dean Williams, but he never used them. Two and a half FTE positions were available in the pharmacology department due to retirements. When Dean Gerald Lazarus took over in 1992, he gave three FTEs to the new Rowe Program (described *infra*); four FTEs to the Basic Sciences division for recruitment purposes; and two FTEs to the Basic Sciences division for "compelling educational needs, *retention*

or requirements of the Associate Dean for Research" (emphasis added). None of these FTEs went to Dr. Chuang, despite the earlier assurances he had received.

After the Chuangs filed their complaint in district court in 1997, the Basic Sciences division filled a number of FTE positions. Three were given to Asian professors, but not to Dr. Chuang.

### B. Forcible Relocation

When the Chuangs joined the faculty in 1982, they were assigned laboratory space in Tupper Hall for their exclusive use. Dr. Gary Henderson, a Caucasian faculty member, refused to remove equipment and materials that he was storing there. In spite of the requests of the Chuangs and the department chairman, Dr. Henderson did not remove the equipment and materials until approximately seven years later. He was not forcibly relocated.

In 1990, when the department made its "diversity"-based hire of Dr. Hanley, Dean Williams asked the Chuangs to give Dr. Hanley two laboratory rooms that they were using for ongoing research. At the time, most of the other faculty members were using their laboratory space for storage purposes; Dr. Chuang was the only faculty member in the pharmacology department conducting active research. Although Dean Williams assured the Chuangs that this arrangement would be temporary, lasting approximately 13–18 months, the rooms were never returned. The Chuangs had to borrow laboratories from other faculty members to continue their research. They relocated their equipment and research in borrowed spaces five times.

Upon becoming dean of the School of Medicine, Dr. Lazarus decided to launch the "Rowe Program," a program in human genetics. The program required 5000 square feet of space. Davis officials initially designated space in Briggs Hall for

---

5. Davis argues, not particularly persuasively in light of the materials in the record, that the "Targets of Opportunity for Diversity" pro-

gram was intended to recruit faculty from outside the university, not qualified minority and women faculty.

this program. They contend, however, that Dr. Michael Seldin, the professor who was to be hired as the Rowe Chair, conditioned his acceptance on receiving the space adjacent to the department of biological sciences on the fourth floor of Tupper Hall—the space occupied by the pharmacology department. In his deposition, Dr. Seldin denied that he had demanded this space.

In open meetings in December 1995, Associate Dean Fitz–Roy Curry assured the Basic Sciences division faculty that no faculty member with an active research program would be affected by the allocation of space for the Rowe Program. Then, on January 29, 1996, Dr. Mannfred Hollinger, the new chairman of the pharmacology department, informed the Chuangs that the department would be moved from the fourth floor to the basement of Tupper Hall. If the Chuangs refused to move out, Hollinger said, the administration would change the locks on their doors. Dr. Tom Jue, a faculty member in the biological chemistry department who had borrowed laboratory space in the pharmacology department, was also told to relocate. Like the Chuangs, Dr. Jue was Chinese–American and had an active research program funded by the NIH. Most of the other pharmacology laboratory rooms on the fourth floor were not in use; they were reserved for "future pharmacologists" or new faculty members not yet identified.[6] The administration did not require Dr. Hanley—the Caucasian faculty member who was using the two rooms from the Chuangs' laboratory, who had no active NIH research grants, and who had since switched to a different department—

to relocate. No Caucasian faculty member with active research was required to relocate.

The Chuangs protested the relocation of their laboratory space, but to no avail.[7] Chairman Hollinger responded to their protests in a hostile manner. He told the Chuangs that if they did not comply, "worse things" than the discontinuation of their research would happen to them; that "when all the shooting is done, there will surely be a casualty"; and that the administration would "physically throw [them] out of the laboratory by force" if necessary. On April 18, 1996, the move of their laboratory began. Members of the dean's office, led by Dr. Ted Wandzilak, began packing and moving the Chuangs' laboratory without their consent, mishandling and damaging expensive equipment and hazardous materials. Dr. Wandzilak admitted to the Chuangs that the administration was acting wrongly, but said that if they challenged the eviction on legal grounds, it would take a long time for the matter to be resolved. On May 6, 1996, Dr. Hollinger observed the relocation process and told the Chuangs, "You should pray to your Buddha for help."

The Chuangs' equipment and materials were crammed into the basement laboratory room that they had been assigned—still occupied by other faculty—with the overflow put in another room. The locks to their fourth-floor laboratory were changed. In declarations submitted below, several Davis faculty members stated in the strongest of terms that the forcible relocation of a researcher's laboratory was unheard of. Several Caucasian faculty mem-

---

6. Even at the time the parties submitted briefs on summary judgment below, there was still enough empty laboratory space on the fourth floor of Tupper Hall for both the Rowe Program and the Chuangs' research needs.

7. The Chuangs made numerous formal and informal complaints with the administration. Their reasons for not wanting to relocate were: (1) the relocation would significantly damage their ongoing research; (2) due to strongly held cultural beliefs, they could not

work in the proximity of the morgue, which is located on the basement floor; and (3) the basement is unsafe for Dr. Linda Chuang who often has to work in the laboratory late at night. With respect to the second reason, Associate Dean Curry advised the Chuangs to enter the basement from an entrance away from the morgue, cover their eyes with their hands as they walked past the morgue to their laboratory, and "pretend" that the morgue was not there.

bers had, in 1996 and earlier, protested the relocation of their laboratory space, but Davis had never evicted them or removed their equipment. Furthermore, an expert on NIH research grants stated that the forcible relocation of the Chuangs' laboratory violated not only Davis's commitment to Dr. Chuang, but also its commitment to the federal agency itself.

Davis's relocation of the Chuangs' laboratory had a calamitous effect on their research programs. The Chuangs' overall research space was significantly reduced. The basement of Tupper Hall was not designed for molecular biology, Dr. Chuang's main field of research. The Chuangs' laboratory rooms and offices are now located on different floors (the fourth floor and the basement), a fact which not only complicates the scientists' work, but also compromises experimental designs due to the safety rules and regulations of the Center for Disease Control and the university itself. The Chuangs lack access to a cold room and other critical facilities. As a result of the relocation, a technician, graduate student, and undergraduate student quit Dr. Chuang's research program, and he has found it difficult to hire qualified replacements. Scheduled experiments were delayed. A colony of monkeys, to be used in a research project, grew too much in the interim and had to be replaced. The NIH withheld research grants on a particular project for eight months, and the Chuangs could not obtain supplemental grants, which would otherwise have been available to them, because they no longer had sufficient laboratory space. Another $75,000 grant was lost entirely.

### C. Investigation of Misappropriated Funds

In June 1994 about $8,000 was misappropriated from Dr. Chuang's NIH research account and diverted to the accounts of the pharmacology department and its chairman. Dr. Chuang made repeated attempts to have the matter investigated by Davis's internal audit office, and complained in writing to various administration officials in 1995 and 1996. The associate director of the internal audit office investigated Dr. Chuang's complaints, provided a written report to the provost, and told Dr. Chuang that the provost would contact him with the findings. The provost did not do so, however, and Dr. Chuang never received any formal response from Davis. In a declaration submitted below, the associate director of the internal audit office asserted that disciplinary actions were taken in response to Dr. Chuang's complaint, but that Dr. Chuang could not be informed of these actions "because of privacy concerns." The internal audit office was itself unable to respond formally to Dr. Chuang's complaint "because of workload."

### D. Proceedings Below

On July 12, 1996, the Chuangs filed a complaint with the Equal Employment Opportunity Commission (EEOC). In 1997 they received a notice of right to sue and filed a Title VII lawsuit, alleging *inter alia* discrimination on the basis of race and national origin, in federal district court. Davis filed a motion for summary judgment; the district court granted it; and the Chuangs filed this appeal.

## II. ANALYSIS

### A. Legal Framework

The parties agree that the applicable legal framework for considering the summary judgment motion in the instant case is that established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Id.* The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, non-

discriminatory reason for the challenged action. *Id.* If the employer does so, the plaintiff must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

█ As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir.1996) (citations and internal quotation marks omitted). Here, contrary to Federal Rule of Civil Procedure 56, the district court did not evaluate the facts in the light most favorable to the Chuangs, but instead resolved material facts that were disputed and disregarded other important evidence. As we will explain, the record supports a finding of illegal discrimination by Davis on two of the Chuangs' claims and warrants a resolution by trial on those claims.

### B. Prima Facie Case

█ Under the *McDonnell Douglas* framework, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... on summary judgment is

minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994) (citation omitted); *accord Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998).

### 1. Denial of FTE Position

█ Dr. Chuang contends that he was unfairly denied a promised FTE position because of his race and/or national origin. Davis argues that Dr. Chuang failed to establish a prima facie case because: (1) he did not apply for the FTEs that became available; and (2) he was not qualified to receive them.[8] Davis does not challenge the other elements of the prima facie case.

█ With regard to Davis's first objection, the university contends that because Dr. Chuang did not apply for the FTEs, the failure to grant him such status did not constitute an adverse employment action. The record shows, however, that Dr. Chuang made several written requests for an FTE. Both the department chairman and the dean promised him that he *would* receive an FTE once one became available. Other faculty members have received FTEs without submitting formal applications. One individual, for example, received an FTE without ever applying for one, partly as an incentive for recruiting her husband, Dr. Seldin, to the school. Furthermore, Dr. Chuang had completed a prestigious RCDA grant in 1989. After a different professor at Davis, Dr. Margaret Meyer, had completed an RCDA grant, the university had considered itself compelled under its terms to award her an FTE.[9] Dr.

8. The district court also held that Dr. Chuang failed to show "differential treatment regarding the denial of an FTE position" because "of the seven FTEs awarded in the Basic Sciences division of the School of Medicine since 1996, three have gone to Asian professors." This point is not relevant to the prima facie requirement. Under *McDonnell Douglas*, a plaintiff must show that an employer treated similarly situated individuals *outside* the plaintiff's protective class more favorably, not that the employer treated all other members *within* the class less favorably. We address the relevance of these post-complaint

hires to the overall disparate treatment inquiry in Section D, *infra*.

9. Davis incorrectly argues that the declaration relating this evidence "lacks foundation, is conclusory, and is hearsay." The statements set forth in Professor Jerold Theis's declaration are based on his personal knowledge of faculty meetings and other events that occurred during his twenty-eight years at the Davis School of Medicine. It is proper evidence under Federal Rule of Civil Procedure 56(e).

Chuang's grant contained the same terms, but Davis did not award an FTE to him. Each of these points supports a finding that any failure by Dr. Chuang to file a formal application as and when individual FTEs became available was irrelevant, and that the filing of such formal applications was not necessary in order for him to establish that he was the subject of an adverse employment action.

 As for Dr. Chuang's qualifications, the district court concluded that Dr. Chuang had failed to establish that he was qualified for the Rowe Program, the School of Medicine's new program in human genetics. This analysis is deficient in several respects. First, there is at least a genuine dispute of material fact as to whether Dr. Chuang's microbiology research and expertise fell within the broad category of "human genetics" and thus qualified him on that basis. Second, at least one individual without experience in human genetics, Dr. Seldin's wife, received a Rowe Program FTE. Third, and most important, Dr. Chuang challenges Davis's failure to award him a pharmacology department FTE, not simply an FTE awarded pursuant to the Rowe Program. Davis could, for instance, have given to Dr. Chuang directly one of the three FTEs that it instead assigned to the Rowe Program in 1992. Or it could have given him one of the other FTEs that became available, such as the FTEs that went to Caucasian individuals in the pharmacology department in 1989 and 1990. The chairman and dean had promised him an FTE at least since 1988, and five FTEs became available in the pharmacology department between then and 1996. On the basis of the record at summary judgment, Dr. Chuang was qualified for at least some, and possibly all, of these FTEs.

In view of the above, we conclude that Dr. Chuang succeeded in establishing a prima facie case of discrimination with regard to his failure to receive an FTE.

### 2. Forcible Relocation

The Chuangs also established a prima facie case with respect to the forcible relocation of their laboratory space. Here, consistent with the district court's decision, Davis contests the third and fourth elements of the *McDonnell Douglas* test. It argues that the forced relocation did not amount to an adverse employment action, and that the Chuangs did not show that they were treated differently than other employees.

 Viewing the evidence favorably to the Chuangs, the relocation of their laboratory space unquestionably qualifies as an adverse employment action. Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that "this not only covers 'terms' and 'conditions' in the narrow sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment.'" *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). *Cf. Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000) (holding that for purposes of a Title VII retaliation claim, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity"). Here, the forcible relocation of the Chuangs' laboratory disrupted important, ongoing research projects. Due to the delay, experimental subjects were lost and research grants were withheld. The Chuangs lost other grants entirely. Both scientists rely on grants for their salary. During the move, fragile, expensive equipment was damaged and misplaced. The Chuangs were moved to a location with qualities— *e.g.,* split-level assignment, reduced space, lack of cold storage—totally inadequate for their ongoing research. Members of Dr.

Chuang's research team quit because of the change in working conditions. Several Davis professors declared that the involuntary move of Dr. Chuang's laboratory was unprecedented and certain to hinder his research. It also violated the university's commitments to the NIH. The forcible relocation involved far more than, as the district court characterized it, "a host of annoyances." The removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment. Assuming the truth of the allegations, the move of the Chuangs' laboratory more than qualified as an adverse employment action.

■■■ The Chuangs also satisfy the fourth element of the *McDonnell Douglas* test, the more favorable treatment of similarly situated individuals outside their protected classes, in at least two different ways. They were forced to give up their laboratory space for a Caucasian faculty member of junior rank, Dr. Seldin. Furthermore, Davis has never relocated the laboratory space of any Caucasian faculty member over the faculty member's objections.[10]

In view of the above, a prima facie case exists as to the forcible relocation also.

### 3. Investigation of Misappropriated Funds

■■■ The Chuangs did not, however, establish a prima facie case on their claim challenging the failure of Davis officials to respond to his grievances regarding the misappropriation of his research funds. The lack of a response does not amount to an adverse employment action. The rec-

ord shows that Davis officials investigated Dr. Chuang's complaint and took unspecified disciplinary actions. While the university's failure to inform Dr. Chuang of its findings or resulting disciplinary actions was certainly irritating and perhaps unjustified, it did not materially affect the compensation, terms, conditions, or privileges of the Chuangs' employment. Nor did the Chuangs present evidence showing that non-Asian or non-Chinese complainants have received formal responses in similar circumstances.[11] We therefore affirm the district court's award of summary judgment on this claim.

### C. Davis's Nondiscriminatory Reasons and Pretext Analysis

■■■ Because the Chuangs established a prima facie case for the first two claims, the burden of production shifts to Davis to articulate a nondiscriminatory reason for each adverse employment action. *St. Mary's Honor Center*, 509 U.S. at 506–07, 113 S.Ct. 2742; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Davis contends that it did not give Dr. Chuang an FTE because he had a full-time position, his position was not in jeopardy, and the dean was prepared to pay for his base salary if the need arose. It also maintains that the forcible relocation of the Chuangs' laboratory was required to accommodate the Rowe Program.

By offering these explanations, Davis has articulated legitimate, nondiscriminatory reasons for its actions. *McDonnell Douglas* requires the Chuangs in turn to raise a genuine factual question whether, viewing the evidence in the light most favorable to them, Davis's reasons are pretextual.

---

10. The Chuangs also argue that no Caucasian faculty member with an ongoing active NIH research program was asked to move during the 1996 relocation. Davis, however, asserts that Dr. Larry Stark also had active ongoing research and was asked to relocate his laboratory space from Tupper Hall. (He did not oppose relocation.) In response, the Chuangs contend that at the time Dr. Stark was not conducting research at Tupper Hall, but at a

different laboratory, and that his research involved only a small amount of grant money, not NIH funds. These disputed facts also require resolution by the factfinder at trial.

11. While Dean Lazarus testified in his deposition that complaints of this nature are meticulously investigated, he did not state whether formal responses are always provided.

We have stated that a plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer. *Godwin*, 150 F.3d at 1220–22. These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper. In this case, while the indirect evidence and direct evidence are independently sufficient to allow the Chuangs to proceed to trial, it is the cumulative evidence to which a court ultimately looks.

### 1. Indirect Evidence

It is not quite accurate to say that at this point the burden of *production* shifts back to the Chuangs. As the Supreme Court recently reaffirmed, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. *Reeves v. Sanderson Plumbing Prods., Inc.,* —— .U.S. ——, ——, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000) (holding that if factfinder rejects employer's proffered nondiscriminatory reasons as unbelievable, it may infer "the ultimate fact of intentional discrimination" without additional proof of discrimination); *see also St. Mary's Honor Center,* 509 U.S. at 511, 113 S.Ct. 2742. While the plaintiff always retains the burden of persuasion, *Reeves,* —— U.S. at ——, 120 S.Ct. at 2106, he does not necessarily have to introduce "additional, independent evidence of discrimination" at the pretext stage, *id.* at 2109. *Accord Schnidrig,* 80 F.3d at 1410–11; *Washington,* 10 F.3d at 1433; *Sischo–Nownejad v. Merced*

*Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir.1991); *Lowe v. City of Monrovia,* 775 F.2d 998, 1008–09 (9th Cir. 1985), *amended by* 784 F.2d 1407 (1986).

Here, we conclude that, with respect to Dr. Chuang's FTE claim, the evidence constituting his prima facie case is sufficiently strong to raise a genuine issue of material fact regarding the truth of Davis's proffered nondiscriminatory reasons. Dr. Chuang's qualifications as a microbiologist and academic are extraordinary: he has developed a reputation as a leading AIDS researcher, published in prestigious journals, and received large amounts of funding from the NIH. Yet he is the *only* full-time faculty member in his department at Davis who has not received an FTE. It also happens that he is the *only* non-Caucasian. He was promised an FTE, but whenever one became available, it was assigned to someone else. Given this evidence, a factfinder could well decide to disbelieve Davis's explanation that (aside from his purported lack of qualifications) it did not offer an FTE to Dr. Chuang because his position was never in jeopardy (a fact due, of course, to the high level of funding he had obtained).[12]

Similarly, we hold that the Chuangs made a sufficiently strong showing in their prima facie case to raise a genuine issue of material fact as to whether Davis's proffered explanation for the forcible relocation of their laboratory is pretextual. Davis contends that Dr. Seldin, the presumptive Rowe Chair, demanded the precise space occupied by the Chuangs on the fourth floor of Tupper Hall, the space adjacent to that occupied by the department of biological chemistry. Dr. Seldin, however, denied this contention in his deposition. This is the sort of evidence that could lead a factfinder to disbelieve Davis. The refusal of Dr. Henderson to remove equipment from the Chuangs'

---

12. We do not suggest that this is the only indirect evidence that supports this aspect of Dr. Chuang's claim. For example, there is also evidence regarding misuse of the "Tar-

gets of Opportunity for Diversity" program to give a Caucasian scientist, but not Dr. Chuang, an FTE position in the otherwise all-white pharmacology department.

laboratory, the failure of Dean Williams to return to them the two rooms assigned to Dr. Hanley in 1990, and the extraordinarily hostile manner in which the School of Medicine evicted the Chuangs are additional facts which contribute to establishing a jury issue as to the falsity of Davis's explanation. *See Reeves,* —— U.S. at —————, 120 S.Ct. at 2110–11. In addition, the circumstances surrounding Davis's failure to give Dr. Chuang the promised FTE may properly be considered in determining whether Davis's explanation regarding the forcible relocation is pretextual. The *Reeves* principle that the same evidence may be used at various stages of a court's analysis applies equally to the use of such evidence with respect to various claims of discrimination. At the summary judgment stage, as well as at trial, any form of evidence of discriminatory treatment that is otherwise admissible may be used to support any allegation of discrimination, whether or not there is a direct relationship between the various claims involved.

### 2. Direct Evidence

 The Chuangs also presented direct evidence of discriminatory motive with respect to both of the claims on which we reverse the grant of summary judgment. In its order, the district court held that direct evidence of pretext had to be specific and substantial. This was error. "With direct evidence, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Blue v. Widnall,* 162 F.3d 541, 546 (9th Cir.1998) (citing *Godwin,* 150 F.3d at 1220–21); *see also Reeves,* —— U.S. at ——, 120 S.Ct. at 2111 (criticizing lower court for failing to draw all reasonable inferences in favor of plaintiff when analyzing direct evidence of discriminatory animus). The plaintiff is required to produce "very little" direct evidence of the employer's discriminatory intent to move past summary judgment. *Godwin,* 150 F.3d at

1221 (quoting *Lindahl v. Air France,* 930 F.2d 1434, 1438 (9th Cir.1991)); *see also Lowe,* 775 F.2d at 1009.

 The Chuangs easily clear this threshold. Two items of direct evidence in this case are particularly significant. First, a member of the Executive Committee, a decisionmaking body for the School of Medicine, Dr. Cross, reportedly stated in a meeting in 1989, just as Dr. Chuang was completing his prestigious five-year NIH Research Career Development Award, that "two Chinks" in the pharmacology department were "more than enough." [13] We need not dwell on the offensiveness of the term used. It is "an egregious and bigoted insult, one that constitutes strong evidence of discriminatory animus on the basis of national origin." *Cf. Cordova,* 124 F.3d at 1149 (discussing allegation that employer referred to another employee as "dumb Mexican"). Dr. Cross's remark establishes discriminatory intent even though it was uttered during consideration of a different Asian–American's potential employment. *Id.* ("[I]f such remarks were indeed made, they could be proof of discrimination against [plaintiff] despite their reference to another agent and their utterance after the hiring decision."). Moreover, it implicates not only the speaker. For purposes of summary judgment, Dean Williams's laughing response to this remark establishes adequate evidence of discriminatory intent on his part also. *Cf. McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817 (observing that an employer's "reaction" to plaintiff's "legitimate civil rights activities" might be relevant to showing of pretext), *cited in Lowe,* 775 F.2d at 1009; *see also Reeves,* —— U.S. at ——, 120 S.Ct. at 2111 (rejecting claim that, as a matter of law, discriminatory remarks must be made "in the direct context" of an adverse employment decision).

---

**13.** The fact that this incident was related in the declaration of a faculty member other than Ronald or Linda Chuang strengthens its value as direct evidence of discriminatory intent. *See Cordova,* 124 F.3d at 1149 n. 5; *Schnidrig,* 80 F.3d at 1411.

The second item of direct evidence is the statement of Dr. Hollinger, the chairman of the pharmacology department, during the forcible relocation of the Chuangs' laboratory. Having already told the Chuangs that they would be physically thrown out of their laboratory and that "worse things" would happen if they continued their protests, Chairman Hollinger told them on May 6, 1996, during the eviction process, that they "should pray to [their] Buddha for help." The district court opined that this statement was "apparently intended as a humorous comment on his and Dr. Chuang's joint plight in the laboratory relocation controversy in which Dr. Hollinger was Dr. Chuang's ally in opposing the move." In drawing this inference in Davis's favor, the district court erred. First, the comment was not humorous. Second, Dr. Hollinger did not share the Chuangs' plight; the record supports a finding that as department chairman, he was instrumental in creating it. (It also indicates that department chairmen play a significant role in hiring faculty and awarding FTEs.) It is not the province of a court to spin such evidence in an employer's favor when evaluating its motion for summary judgment. To the contrary, all inferences must be drawn in favor of the non-moving party. Like the "two Chinks" incident, the admonition of a high-ranking official to an Asian–American employee to "pray to your Buddha" during the time of an adverse employment action is sufficient evidence of discriminatory motive for purposes of *McDonnell Douglas* pretext analysis.

### 3. Cumulative Evidence

In view of the conclusions we have reached with respect to both the indirect evidence and the direct evidence, there can be no doubt that on the basis of the cumulative evidence, the Chuangs have, for purposes of summary judgment, established pretext on Davis's part.

### D. Post–Complaint Hires

Lastly, with respect to Dr. Chuang's claim for denial of an FTE position, the district court held that he failed to show "differential treatment regarding the denial of an FTE position." Specifically, according to the district judge, Dr. Chuang did not refute Davis's evidence that "of the seven FTEs awarded in the Basic Sciences division of the School of Medicine since 1996, three have gone to Asian professors." Davis cites this fact in its brief, but wisely refrains from relying on it as a basis for affirming the district court's decision.

As an initial matter, the record does not reveal the national origin of these new hires. An employer's favorable treatment of "Asian" employees does not answer a claim of discrimination based on national origin. *See Lam v. University of Hawaii*, 40 F.3d 1551, 1561 n. 16 (9th Cir.1994) ("[I]t is significant that Lam and the Asian male candidate were of different national origins—Lam being Vietnamese–French, the male candidate, Chinese. Lam alleged not only race discrimination but also national origin discrimination, thereby raising this distinction as relevant under Title VII.").

More important, the three Asian professors were hired, according to the Chuangs, long after the Chuangs filed their complaints with the EEOC and their lawsuit in federal court. If accurate, this timing would eliminate any probative value the evidence might otherwise have. "Given the obvious incentive in such circumstances for an employer to take corrective action in an attempt to shield itself from liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the employer." *Lam*, 40 F.3d at 1561 n. 17 (citing *Gonzales v. Police Dep't, City of San Jose*, 901 F.2d 758, 761–62 (9th Cir.1990)). In *Gonzalez* this court reviewed rulings calling into doubt the relevance of an employer's post-complaint promotion of minority employees in cases seeking prospective relief against discriminatory employment practices. 901 F.2d at 762. It then found the

**1130**

irrelevance of such evidence "even more apparent" in disparate treatment cases like this one addressing "whether discrimination occurred prior to the commencement of a Title VII action." *Id.* "Curative measures simply do not tend to prove that a prior violation did not occur." *Id.*

Davis's subsequent hiring practices are therefore irrelevant to the question whether Dr. Chuang was subjected to discrimination from 1982 to 1997. On remand, the district court should exclude at trial evidence of Davis's post-complaint hiring of Asian–American professors, unless the university can prove that it made its hiring decisions before it became aware that the Chuangs intended to pursue their complaints.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment on Dr. Ronald Chuang's challenge to the denial of his promised FTE position and the Chuangs' challenge to the forcible relocation of their laboratory in 1996.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.