**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIFFANY ANNE NICHOLSON,
          *Plaintiff-Appellant,*

          v.

HYANNIS AIR SERVICE, INC., DBA
Cape Air,

          *Defendant-Appellee.*

No. 08-15959

D.C. No.
1:06-cv-00027

OPINION

Appeal from the United States District Court
for the District of Guam
Frances Tydingco-Gatewood, Chief District Judge, Presiding

Argued and Submitted
February 11, 2009—Honolulu, Hawaii

Filed September 8, 2009

Before: Stephen Reinhardt, Melvin Brunetti, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Reinhardt

---

**COUNSEL**

Phillip Torres, Hagåtña, Guam, for the plaintiff-appellant.

David Ledger, Elyze J. McDonald, Hagåtña, Guam, for the defendant-appellee.

---

**OPINION**

REINHARDT, Circuit Judge:

Tiffany Anne Nicholson alleges that her former employer Cape Air discriminated against her on account of her sex when it suspended her from flying the two-pilot ATR 42 airplane on Cape Air's Guam and Micronesia routes. The district court granted Cape Air's motion for summary judgment, finding that Nicholson could not establish a prima facie case of discrimination, nor that Cape Air's explanation for its disciplinary action was a pretext for discrimination. She appeals the grant of summary judgment to Cape Air. We reverse.

**FACTUAL BACKGROUND**

Defendant-Appellee Hyannis Air Service, Inc., which does business as Cape Air (hereinafter "Cape Air"), is a small regional airline based in Hyannis, Massachusetts. Plaintiff-

Appellant Tiffany Anne Nicholson was hired as a Cape Air pilot in 2000. From 2000 until 2004, she piloted a Cessna 402 aircraft, of which she was the Captain and sole pilot in its one-pilot cockpit. Although she never flew a two-pilot airplane, there is no indication in the record that she ever had any difficulty with her communication or cooperation skills during this period.

In 2004, Nicholson was one of eight pilots selected to launch Cape Air's new service providing flights between Guam and the neighboring Micronesian islands for Continental Airlines. She was the only woman among the eight pilots selected to fly the new routes. The pilots group also included Chuck White, a captain with whom Nicholson had previously had a year-long sexual relationship. The service was overseen by Cape Air's Pacific Regional Administrator Russell Price. Price and Nicholson had been the subject of rumors that traveled throughout Cape Air suggesting that they were sexually involved.

Cape Air's new Guam service was provided using ATR 42 airplanes rather than Cessna 402s. The ATR 42, unlike the Cessna 402, has a two-pilot cockpit, and each flight requires both a captain and a first officer. The eight pilots in the Guam program were selected based upon their seniority, with the four most senior pilots serving as captains. Nicholson was qualified to serve as a captain but, because she was one of the more junior pilots, she flew as a first officer. Because the Guam service involved an airplane that was new to Cape Air's operations, all eight pilots received training consisting of ground school in Hyannis and simulator training at Flight Safety, an independent company in Houston, Texas. The training included instruction in both the operation of the ATR 42 and crew resource management ("CRM"). CRM consists of the communication and cooperation skills that enable the pilots and crew of an airplane to work together to maximize the safety and efficiency of a flight.

During the training in Houston, two male pilots failed their check rides in the simulator. They were retrained to proficiency and passed on their second attempt. Nicholson did not fail any tests or check rides. On June 14, 2004, her Flight Safety instructor rated her communication and cooperation skills as "excellent."

After the pilots began to fly the new routes between Guam and its neighbors, however, Nicholson's supervisors and the other pilots reported that she exhibited problems with her communication and cooperation skills. Cape Air's Director of Training David O'Connor asserted that Nicholson had a "machismo" attitude, was dismissive of input from others, and refused to provide assistance requested by her co-pilots. The four captains in the Guam program also reported to Price that Nicholson's CRM skills were inadequate.

Price responded to the reports of Nicholson's CRM deficiencies by formulating a plan to observe her CRM skills in-flight. Before Price could begin his observation, however, White removed her from an August 31, 2004 flight. White was scheduled to fly a number of flights with Nicholson that day, but he claimed that the tension in the cockpit during their first flight of the day made the cockpit unsafe. White permitted Nicholson to fly the plane back to Guam, then removed her from the plane before their next flight. White acknowledged at his deposition that he had concerns about flying with Nicholson because of their prior sexual relationship, and further admitted that, in deciding whether to remove Nicholson from the flight, he had been unsure whether his negative interactions with Nicholson were related to their prior relationship.

Price responded to Nicholson's removal from White's plane by requiring her to spend four days observing other pilots and flying under Price's observation. Price first asked her to observe another pair of pilots. Nicholson observed two of the seven or eights flights the pilot team was scheduled to fly that day. The following day Price asked Nicholson to fly

with John Kappeyne while Price observed their interactions. She arrived without a required headset and was unable to fly for a large part of the day. According to Price, when Nicholson did fly with Kappeyne her CRM skills were deficient but Kappeyne's authoritarian approach "kept [her] on a very tight leash."

The following day, Price decided to have Nicholson fly with White once again while Price observed from the jumpseat. The resulting flight was, according to Price, one of his "top ten scary and dangerous flights" because of White and Nicholson's inability to communicate effectively. Price claimed that Nicholson was "defensive, antiauthoritarian, ego-driven;" made one serous mistake but was not humbled by it; and caused a "total breakdown of CRM." At the end of the flight, Price asked White and Nicholson how the flight had gone. White was speechless and pale, while Nicholson said, "It's like this most days," and told Price that the earlier flight from which White had first removed her had been similar. After the return flight to Guam, Price ordered her off the plane and flew in her place for the remainder of the day.

Following her second removal from a flight, Cape Air required Nicholson to return to Hyannis to meet with Cape Air management regarding her alleged CRM problems. Based on reports provided by a number of pilots, including Price, and conversations with Nicholson herself, a disciplinary panel prepared an Action Form. The Action Form provided as its reason for action: "Unable to interact and communicate effectively in a flight crew environment. Failed to assist the captain in the most efficient manner possible to make certain flights were accomplished at the highest level of safety as required by the GOM. Uncooperative attitude and inconsistent CRM skills created unsafe operating conditions in the cockpit."

The Action Form prohibited Nicholson from flying ATR 42s. Instead, she was permitted to fly only (single-pilot) Cessna 402s outside of the Pacific region (i.e., outside of

Guam and Micronesia). Nicholson's removal from the ATR 42 program could be reviewed in 18 months. In addition, Nicholson was required to consult an employee assistance program to address her CRM problems and to attend CRM training at Flight Safety in Houston. Finally, she was placed on probation for six months.

One week later, the Action Form was revised to permit Nicholson to fly Cessna 402s in the Pacific region, including Guam, and to provide for review of her ability to fly ATR 42s in six months rather than eighteen.

Nicholson appealed the Revised Action Form, and it was reviewed and affirmed by human resources director Linda Markham and Cape Air CEO Dan Wolf. The record does not indicate whether Nicholson was ever informed of Wolf's decision. Rather than bidding for Cessna 402 flights, as the Revised Action Form permitted her to do, Nicholson bid on ATR 42 flights for which she was no longer eligible. Cape Air considered her to have abandoned her position with Cape Air, and she was terminated. The record does not reveal, and the parties could not state at oral argument, whether she was ever informed that her failure to bid on Cessna 402 flights would result in her termination.

Nicholson alleges that the complaints about her CRM skills leading to her discipline and the decision to remove her from the ATR 42 program resulted from her being the only woman in the program, rather than from her alleged CRM deficiencies. According to Nicholson, she was removed from the ATR 42 program because she "was the only female in an all male situation and . . . the guys didn't think that they would be able to do what they wanted with a girl hanging around." She claims that Cape Air's actual purpose in disciplining her was to remove an object of sexual competition from its Guam service.

In support of her allegations, Nicholson asserts that she does not suffer from any CRM deficiencies and that, even if

her skills were deficient, she was removed from the program without being provided the same retraining opportunity provided to the male pilots who failed portions of their training. Nicholson also alleges that the company's disciplinary procedures were cursory and irregular. She asserts that the initial ban on her flying all planes in the Pacific Region reflects the company's desire to eliminate the sexual tension that resulted from her presence in the area, even though the company quickly realized its error and withdrew that part of its discipline a week later. Finally, Nicholson notes that White admitted that the prior sexual relationship affected his working relationship with Nicholson; that Markham had confronted Price regarding his rumored relationship with Nicholson shortly before the incidents leading to her discipline; and that in November 2004 White suggested to Nicholson that nothing would have happened to her had she not rebuffed his efforts to rekindle their relationship.

## Procedural History

After receiving a right to sue letter from the EEOC, Nicholson filed an action against Cape Air, alleging that she had been demoted from the ATR 42 program on account of her sex in violation of Title VII, 42 U.S.C. § 2000e-2. The district court granted Cape Air's motion for summary judgment, finding that Nicholson could not establish a prima facie case because her lack of communication and cooperation skills made her unqualified to fly ATR 42s, and because there were no similarly situated employees who were treated more favorably. The district court also found that, even if Nicholson could establish a prima facie case, summary judgment for Cape Air was appropriate because she had not presented evidence to rebut Cape Air's legitimate, non-discriminatory explanation for its actions, namely, that she was disciplined on account of her CRM deficiencies. Nicholson filed a timely notice of appeal.[1]

---

[1]The district court's grant of summary judgment is reviewed de novo. *Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d

**Discussion**

To prove her claim of discrimination, Nicholson relies upon the three-step burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). We analyze each step in turn.

## I.   Nicholson's Prima Facie Case

**[1]** "Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Chuang v. Univ. of Cal. Davis Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000) (citation omitted). Cape Air does not dispute that Nicholson is a member of a protected class (women) and that Nicholson suffered an adverse employment action (removal from eligibility to fly ATR 42s). Accordingly, we need determine only whether Nicholas was qualified for the position, and whether similarly situated individuals were treated more favorably.

### A.   Nicholson Was Qualified

Cape Air alleges, and the district court held, that Nicholson cannot establish a prima facie case under *McDonnell Douglas* because her CRM deficiencies rendered her unqualified to fly

922, 925 (9th Cir. 2007). Summary judgment is appropriate where no genuine issue of material fact exists and a party is entitled to prevail in the case as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The reviewing court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." *Bank of New York v. Fremont Gen. Corp.*, 514 F.3d 1008, 1014 (9th Cir. 2008).

ATR 42s. Nicholson claims that her CRM skills were sufficient, and that, regardless, CRM skills are a subjective job qualification that should not be considered at the first phase of the *McDonnell Douglas* analysis. Because Nicholson is correct that CRM skills are a subjective qualification that cannot be considered in evaluating a plaintiff's qualifications at the first step of *McDonnell Douglas*, the district court erred in finding that Nicholson was not qualified.

**[2]** This court has long held that subjective criteria should not be considered in determining whether a plaintiff is "qualified" for purposes of establishing a prima facie case under *McDonnell Douglas*. Instead, "[t]he qualifications that are most appropriately considered at step one [of *McDonnell Douglas*] are those to which objective criteria can be applied . . . ." *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1345 n.8 (9th Cir. 1981).

*Lynn* involved an allegedly discriminatory decision to deny a professor tenure. The university argued that the plaintiff could not establish a prima facie case under *McDonnell Douglas* because her deficient scholarship rendered her unqualified for tenure. We rejected that argument and held that, for the purposes of *McDonnell Douglas*'s first step, Lynn's qualifications had to be determined by objectively measurable criteria "such as level of education, years of teaching experience, in general and at the particular institution, and the publication of scholarly materials." *Id.* As we explained, "subjective criteria, along with any supporting evidence, are best treated at the later stages of the process. To do otherwise would in many instances collapse the three step analysis into a single initial step at which all issues would be resolved . . . . defeat[ing] the purpose underlying the *McDonnell Douglas* process." *Id.* at 1344. Accordingly, we held that the scholarly merit of Lynn's work should be considered only at the second and third steps of the *McDonnell Douglas* framework. *Id.* at 1344-45.

**[3]** *Lynn*'s reasoning is as applicable to a pilot's CRM skills as to the scholarly merit of a professor's work. The evaluation of a pilot's communication and cooperation skills requires a subjective evaluation of the pilot's attitude, manner, tone, and other similar traits — evaluations that are inherently subjective. Here, as in *Lynn*, if such subjective criteria are considered in evaluating a plaintiff's qualifications at step one of the *McDonnell Douglas* inquiry, the entire burden-shifting scheme collapses into a single inquiry into the truth of a subjective claim regarding Nicholson's alleged inadequacies. Thus, here as in *Lynn*, the first step must focus on the plaintiff's objectively measurable qualifications.[2]

Cape Air argues that the subjective/objective distinction should not apply to CRM skills because "CRM for an ATR 42 pilot is an elemental and necessary qualification" and a pilot may "put lives in danger for failing to exhibit proper communication skills." However, the distinction announced in *Lynn* does not turn on the importance of a particular qualification to the job. It turns instead on the subjective or objective nature of the matter in question. Here, the subjective nature of Nicholson's alleged deficiencies is most apparent from the fact that an instructor at Flight Safety rated her CRM skills "excellent" in June 2004, while her Cape Air co-pilots

---

[2]In determining that a pilot's CRM skills should not be considered at step one of the *McDonnell Douglas* inquiry, we reach the same conclusion as the only other federal court to have considered the issue. The District of Minnesota, relying in part upon our decision in *Lynn*, has twice held that CRM skills should not be considered at step one. *See Ludwig v. Northwest Airlines, Inc.*, 98 F. Supp. 2d 1057, 1064-65 (D. Minn. 2000) (considering only "minimum objective criteria" required to be a Northwest pilot at step one, and excluding from consideration various subjective criteria including "CRM skills"); *Axtell v. Northwest Airlines, Inc.*, No. Civ. 972632 ADM/AJB, 1999 WL 33912056, at *4 (D. Minn. June 30, 1999) ("While recognizing NWA's interest in evaluating a candidate's CRM and technical skills through an interview process, the law of this circuit makes it clear that only objective criteria can be used when evaluating whether a plaintiff has made out a prima facie case.").

claimed only two months later that CRM deficiencies made her unsafe to fly.

Cape Air defends the district court's finding that Nicholson was not qualified on two additional grounds. First, Cape Air argues that Nicholson waived her argument that subjective criteria should not be considered at step one by failing to raise it in the district court. However, Nicholson's argument simply provides additional legal support for a contention that Nicholson indisputably raised below, i.e., that she was qualified to fly ATR 42s. Accordingly, Nicholson is not precluded from raising the argument here. *See Silveira v. Apfel*, 204 F.3d 1257, 1260 n.8 (9th Cir. 2000) (considering argument raised for the first time on appeal where the argument was "a pure question of law, and the [opposing party] had the opportunity to respond to the argument on appeal").

Second, Cape Air argues that Nicholson cannot meet the "objective" criteria for flying ATR 42s. According to Cape Air, while its general operating manual requires first officers to "assist the captain, maintain a high degree of crew coordination and cockpit discipline, and perform other duties required by the captain," Nicholson has demonstrated that she cannot do these things. This argument fails for two reasons. First, there is at the very least a factual dispute as to whether Nicholson is *able* to perform each of these tasks, because she was at times praised for her behavior in the cockpit. Second, and more important, the deficiencies identified by Cape Air as "objective" are simply a subset of Nicholson's subjective CRM skills, and thus cannot be considered in evaluating Nicholson's prima facie case.

**[4]** Accordingly, the district court erred in finding that Nicholson was not qualified for the job of an ATR 42 pilot. Considering only the objective criteria required to perform as an ATR 42 pilot, Nicholson was clearly qualified.

### B. Nicholson Has Produced Evidence that Similarly Situated Employees Were Treated More Favorably

To establish the fourth element of her prima facie case, Nicholson must produce evidence that similarly situated male pilots were treated more favorably than she was. *See Chuang*, 225 F.3d at 1123. To do so, Nicholson points to two male pilots who failed portions of their training at Flight Safety and were then given additional training and a second opportunity to pass that portion of the training, rather than being immediately removed from the ATR 42 program. Nicholson alleges that she received no such second opportunity prior to her removal from the program. Cape Air responds that, because the deficiencies these two pilots exhibited were technical rather than CRM-related, neither was similarly situated to Nicholson. Cape Air also asserts that the pilots were not treated more favorably because Nicholson also received retraining — namely, the plan implemented by Price following Nicholson's removal from White's plane. According to Cape Air, it was only after she failed this second round of training that she was removed from the ATR 42 program.[3]

### 1. The Other Pilots Were Similarly Situated

[5] "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). The employees need not be identical; they must simply be similar "in all *material* respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (emphasis added).

The district court found that the two pilots who required retraining while at Flight Safety were not similarly situated

---

[3]Cape Air does not contend that the male pilots were not similarly situated to Nicholson because their deficiencies were recognized and addressed during the pilots' training at Flight Safety rather than after Cape Air's Guam service was up and running.

because they did not "engage[ ] in comparable conduct, specifically, deficient and unsafe CRM skills," and because "[o]ne can be retrained and refine their piloting skills; however, if personality is an issue, the CRM skills, if not improved upon, may continue to pose a real risk of safety." However, the distinctions drawn by the district court were not material: Both technical piloting and CRM skills involve deficiencies that can be addressed through retraining, as Cape Air's own practices demonstrate, and deficiencies in both "pose a real risk of safety" if unaddressed. Indeed, Cape Air itself has "urge[d] this Court not to divorce CRM skills from technical skills when evaluating an ATR 42 pilot's qualifications."

In suggesting that technical skills can be "retrained and refine[d]" while CRM skills are somehow more permanent, the district court failed to consider the abundant evidence in the record regarding the CRM training required of all pilots. This evidence showed that Cape Air treats CRM as a particular skill that can be retrained and refined; were it otherwise, the remedial program suggested by Cape Air in Nicholson's Revised Action Form would have been pointless. In fact, Cape Air required that Nicholson's CRM training be provided by the exact same flight school where the two male pilots received additional training to remedy their deficiencies. Furthermore, deficiencies in both CRM skills and technical piloting skills, "if not improved upon, may continue to pose a real risk of safety." If anything, a pilot's technical failings may pose an even greater risk to the safety of crew and passengers.

[6] Thus, although CRM skills are different from the other skills required of pilots, any distinction between CRM skills and technical piloting skills is not material for purposes of determining whether the male pilots were "similarly situated" to Nicholson. The CRM skills allegedly lacking in Nicholson and the technical piloting skills lacking in the male pilots each were skills required of pilots and necessary for safe flying, and Cape Air treated both sets of skills as ones that could be

acquired and improved upon through training. Because any distinctions were not material, the male pilots were similarly situated.

### 2. *The Male Pilots May Have Been Treated More Favorably*

We must not only identify similarly situated male employees, however; we must also conclude, taking all evidence in the light most favorable to Nicholson, that those employees were treated more favorably, i.e., that Nicholson did not receive the same opportunity for additional training as the male pilots.

According to Cape Air, the remedial program instituted by Price following Nicholson's first removal from White's plane was a second round of training comparable to the additional training received by the male pilots. Price testified that he explained to Nicholson "[s]everal times" that her job was at stake, that her lack of CRM skills was "a serious safety issue," and that if it was not fixed "job action . . . including termination would be the result." However, Nicholson claims that she was not offered any remedial training. According to Nicholson, when Price observed her flying he did not offer any constructive criticism, other than telling her that she might ask too many questions, and she received no advice at all as to how she might correct her supposed deficiency.

[7] Construing the evidence in Nicholson's favor, the male pilots received comprehensive remedial training at Flight Safety in order to correct their deficiencies, while Nicholson received no instruction and little, if any, constructive criticism prior to being suspended from the ATR 42 program, initially for eighteen, later modified to six, months. This qualitative difference in treatment provides sufficient evidence that Nicholson was treated less favorably than similarly situated male pilots to preclude summary judgment at *McDonnell Douglas*'s first step.

## II.   Cape Air Articulated a Legitimate, Nondiscriminatory Reason for its Actions

**[8]** Because Nicholson produced evidence sufficient to establish a prima facie case under *McDonnell Douglas*, "[t]he burden of production, but not persuasion, . . . shifts to [Cape Air] to articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang*, 225 F.3d at 1123-24. Here, Cape Air alleges that Nicholson was suspended from the ATR program due to her CRM deficiencies. Cape Air's allegation is supported by substantial evidence, including the testimony of Nicholson's co-pilots and supervisors, their letters to the disciplinary panel, and the original and revised Action Forms. Cape Air has thus met its burden of production at step two.

## III.   Nicholson Produced Sufficient Evidence of a Discriminatory Motive To Survive Summary Judgment

**[9]** At the third step of the *McDonnell Douglas* scheme, "the plaintiff must show that the articulated reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 1124 (internal quotation marks omitted). To avoid summary judgment at this step, however, the plaintiff must only demonstrate that there is a genuine dispute of material fact regarding pretext. The amount of evidence required to do so is minimal. "We have held that very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder. When the evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004)

(alterations omitted) (citations and internal quotation marks omitted).

**[10]** Nicholson has met her minimal burden at step three. First, irregularities in Nicholson's disciplinary proceedings provide some evidence that Cape Air had a discriminatory motive. The disciplinary panel conducted a cursory investigation, and Nicholson introduced evidence that Cape Air actively procured letters complaining about Nicholson from other pilots. According to one pilot, Price *demanded* that he prepare a derogatory letter about Nicholson.[4] In her affidavit, Nicholson also notes various departures by Cape Air from the procedures established in its employee handbook. However, Nicholson failed to introduce that handbook into evidence. Fed. R. Civ. P. 56(e)(1) requires the attachment of any document "referred to in an affidavit." "Lacking [the required] documentation," Nicholson's claims regarding the employee handbook are "nothing more than an . . . argument lacking evidentiary support." *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993).[5]

---

[4]Cape Air, while noting at oral argument before us that this statement was hearsay, did not move in the district court to strike the statement from Nicholson's declaration, and thus waived any hearsay objection.

[5]The employee handbook was attached to a proposed sur-reply, but the district court denied Nicholson's motion to file that sur-reply. Nicholson argues that the employee handbook is nonetheless part of the record on appeal and can be considered by this court. According to Nicholson, the handbook was "filed" with the district court within the meaning of Fed. R. App. P. 10(a)(1), which defines the record on appeal, because a clerk's stamp on the front of the proposed sur-reply states that it was "filed" on Feb. 22, 2008. Nicholson's argument, while inventive, fails. We cannot accept any argument that would permit the clerk's office to override a judge's decision as to whether a particular document may be "filed" with the court. Nicholson's proposed sur-reply was, instead, merely "lodged" with the district court. *See Barcamerica Int'l. v. Tyfield Imps., Inc.*, 289 F.3d 589, 594-95 (9th Cir. 2002) (declining to consider excerpts of deposition transcripts lodged with district court but not filed in support of or in opposition to a motion); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 684 (9th Cir. 1993) (striking factual allegations based on amended com-

**[11]** Cape Air's knowledge, however, of the rumors about Nicholson and Price and of her prior relationship with White does provide additional evidence that her employer, in Nicholson's words, "wanted to remove an object of sexual competition, and therefore, discord, from the pilot group on Guam." This inference is bolstered in particular by the fact that the Action Form initially prohibited Nicholson from flying Cessna 402s in the Pacific region, including Guam, notwithstanding her acknowledged ability to fly such single-pilot planes safely. It is also supported by White's alleged statement, a week after Nicholson was terminated, that she "would still have [her] job if [they] were still together," as well as by Cape Air's silence upon being informed of White's comment.

**[12]** Finally, the evidence introduced by Nicholson to establish her prima facie case also provides evidence of pretext. "[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." *Chuang*, 225 F.3d at 1127 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000). In this case, Cape Air's failure to treat Nicholson in the same manner that it treated similarly deficient male pilots provides some evidence that Cape Air disciplined her because of her sex and not because of her alleged CRM deficiencies. So, too, do the sex-related remarks, such as the complaint that Nicholson had a "machismo" attitude; the captain's concern about flying with her because of a prior sexual relationship; and the removal of her from a flight by that same captain, who expressed concern about whether his

---

plaint "lodged with, but not accepted for filing by, the district court"). Because the documents attached to the sur-reply were not "filed" with the district court, and Nicholson does not appeal the rejection of her sur-reply by the district court, the documents are not part of the record on appeal and are not before this court.

work problems with her were related to that earlier relationship.

**[13]** In employment discrimination cases brought under the *McDonnell Douglas* framework, "[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by the factfinder, upon a full record." *Sischo-Nownejad v. Merced Comty College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991) (internal quotation marks omitted). Because Nicholson introduced the minimal evidence necessary to raise a genuine issue of material fact as to whether Cape Air suspended her because of her sex, the district court's grant of summary judgment to Cape Air was improper.

## IV. Cape Air's Request for Sanctions

**[14]** Nicholson's arguments on appeal rely in part upon evidence that was not filed with the district court — deposition excerpts that were attached to Nicholson's proposed sur-reply. Nicholson did not appeal the district court's rejection of the proposed sur-reply. However, she nonetheless included five pages from these deposition excerpts in her Excerpts of Record. Because Nicholson included in her excerpts of record deposition excerpts that were not filed with the district court, she violated Fed. R. App. P. 10(a)(1), which provides that the record on appeal consists of "the original papers and exhibits filed in the district court." Cape Air asks that we sanction Nicholson for this violation by striking portions of her argument and her Excerpts of Record, and by imposing monetary sanctions.

**[15]** As required by Rule 10(a)(1), we disregard all arguments that depend upon the improperly included material and strike that material from the Excerpts of Record. However, monetary sanctions are not warranted. Nicholson included only five improper pages, and the arguments based on those

pages are peripheral to the primary issues on appeal. The consequences of Nicholson's violation are too minimal to justify monetary sanctions.

Cape Air claims that *Lowry v. Barnhart*, 329 F.3d 1019 (9th Cir. 2003), establishes that violations of Rule 10 are particularly serious, and that monetary sanctions, including reasonable attorneys fees for preparing a brief including a discussion of the improper information, should generally be awarded for violations of Rule 10. However, *Lowry* involved a much more serious violation of that Rule: The offending party in *Lowry* included in its supplemental excerpts of record a new document that did not exist at the time of the district court's decision or at the time the appellant filed his opening brief. *Id.* at 1024. Furthermore, the offending party in *Lowry* acknowledged that its conduct was indefensible. *Id.* at 1025. In determining that sanctions were proper under the circumstances of that case, we specifically noted that monetary sanctions have been found to be improper where the offending party "contended that the documents were, in fact, part of the record" and where "the 'issue [was] one of first impression.' " *Id.* at 1026 n.7 (citing *Barcamerica*, 289 F.3d at 593-95; and *Tonry v. Security Experts, Inc.*, 20 F.3d 967, 973 (9th Cir. 1994)). Both conditions exist here: As noted above, *supra* note 5, Nicholson contends that the material is properly a part of the record, and no prior Ninth Circuit case has specifically held that a rejected sur-reply is not "filed" for purposes of Rule 10(a)(1).

Accordingly, we will not award monetary sanctions to Cape Air for Nicholson's violation of Rule 10(a).

## CONCLUSION

**[16]** Because the evidence, when taken in the light most favorable to Nicholson, is sufficient to raise a genuine issue of material fact as to whether she was qualified and whether similarly situated male pilots were treated more favorably, the

district court erred in granting summary judgment on the ground that Nicholson could not establish a prima facie case of discrimination. Furthermore, because Nicholson introduced the minimal evidence required to raise a factual issue regarding whether Cape Air's actions were taken because of her sex, the district court's grant of summary judgment to Cape Air was improper. We reverse the district court's decision and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**