**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERIC J. LINDSEY, dba E-JAYS
PANACHE IMAGES,
                *Plaintiff-Appellant,*

v.

SLT LOS ANGELES, LLC, a
Delaware Limited Liability
Corporation; STARWOOD HOTELS &
RESORTS WORLDWIDE, INC., dba THE
WESTIN and WESTIN HOTELS;
WESTERN HOST, INC., a California
Corporation, dba THE WESTIN
HOTEL,
                *Defendants-Appellees,*

                and

THE WESTIN LOS ANGELES AIRPORT;
and JOHN DOES 1 through 10,
inclusive,
                *Defendants.*

No. 03-55824

D.C. No.
CV-02-3822-GAF

ORDER
AMENDING
OPINION AND
DENYING
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Gary Allen Feess, District Judge, Presiding

Argued and Submitted
February 8, 2005—Pasadena, California

Filed December 20, 2005
Amended May 17, 2006

5331

Before: Harry Pregerson and William C. Canby, Jr.,
Circuit Judges, and Edward C. Reed, Jr.,* District Judge.

Opinion by Judge Reed

---

*The Honorable Edward C. Reed, Jr., Senior United States District
Judge for the District of Nevada, sitting by designation.

**COUNSEL**

Felipa R. Richland, Beverly Hills, California, for the plaintiff-appellant.

Robert Jon Hendricks, Sophy C. Woodhouse; Morgan, Lewis & Bockius, LLP, Los Angeles, California, for the defendants-appellees.

**ORDER**

The Opinion filed on December 20, 2005, and appearing at 432 F.3d 954, is amended as follows:

1.  At 958, the last text sentence of section I, along with the citations, shall be replaced with the following: "This Court has set a high standard for the granting of summary judgment in . . . discrimination cases . . . 'because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by a factfinder, upon a full record.' " *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (quoting *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1563 (9th Cir. 1994)).

2.  At 959, the citation following the last sentence of the first paragraph of section II.A. shall be replaced with the following: *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

3.  A new section II.C.3. will be added after the complete section II.C.2. and before the Conclusion:

### 3. The absence of direct evidence of discriminatory intent does not mandate summary judgment.

As discussed above in the analysis of the Supreme Court's holding in *Reeves* in section II.C., credibility attacks alone may provide enough circumstantial evidence to support a finding of intentional discrimination if no legitimate reasons for different treatment remain. While direct evidence of discriminatory intent, such as racial slurs, could further support such a finding, they are not required if a *prima facie* case has been established and the plaintiff presents "specific" and "substantial" "circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

Here, there is specific and substantial evidence that non-African-Americans were treated differently from African-Americans. Stark testified that he never consulted with the Kermanis or offered them options other than the Grand Ballroom; yet, he claims he partially based his decision on Panache's refusal of other options. Stark apparently gave emphasis to certain documents or parts of documents in the files that favored the Kermanis, but ignored documents or parts of documents in the files that favored Panache. Stark refused to offer any assistance to Panache in relocating the event. Finally, Stark allowed a non-African-American group that could fit in another room to have the only room that the African-American group could fit in. All of this presents enough of a triable issue of fact that non-African-Americans were treated differently from African-Americans to infer discrimination, if the factfinder decides that no legitimate or

credible reasons for the different treatment exist. *See Chuang*, 225 F.3d at 1127-28 (noting that disputes regarding alleged discriminator's proffered reasons and refusal to offer assistance that could mitigate effects of some of the alleged discriminatory actions presented indirect evidence of pretext).

\* \* \*

With these amendments, the panel, as constituted above, has unanimously voted to deny the petition for panel rehearing. Judge Pregerson has voted to deny the petition rehearing en banc, and Judges Canby and Reed have so recommended. The petition for rehearing en banc has been circulated to the full court, and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35(b).

The petition for panel rehearing and the petition for rehearing en banc are DENIED. No subsequent petitions for panel rehearing or rehearing en banc may be filed. There are no pending petitions for panel rehearing or rehearing en banc that have not been ruled on.

## OPINION

REED, District Judge:

Appellant Eric J. Lindsey, dba E-Jays Panache Images, ("Panache" or "Appellant") appeals the district court's grant of summary judgment for Appellees SLT Los Angeles, Starwood Hotels & Resorts Worldwide, Inc., Western Host, Inc. ("the Westin" or "Appellees"). The district court concluded that Appellant Panache had failed to prove that the Westin's actions, which had prevented Panache from hosting its annual Mother's Day Fashion Show in the Grand Ballroom of the Westin Hotel, presented a *prima facie* case of race discrimina-

tion pursuant to 42 U.S.C. § 1981. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court and remand for trial.

## FACTS AND PROCEDURAL HISTORY

### I.  Procedural History

On May 10, 2002, Appellant filed a Complaint for Damages alleging violations of 42 U.S.C. § 1981; violations of the California Unruh Act; breach of contract; intentional infliction of emotional distress; intentional interference with business prospective; and fraud. Appellees filed a Motion for Summary Judgment on March 20, 2003, which Appellants opposed on March 31, 2003. Appellees filed their Reply in support of their Motion for Summary Judgment on April 7, 2003. On April 9, 2003, the district court filed an order granting summary judgment in favor of Appellees, dismissing the § 1981 claim with prejudice and the supplemental state claims without prejudice.

### II.  Facts

The following facts are presented in the light most favorable to the non-moving party, Appellant Panache.

Panache is a company that presents fashion shows. All of its representatives are African-American, and its audience members are predominantly African-American as well. For the three years prior to the events giving rise to this lawsuit, Panache held its annual Mother's Day Fashion Show and Luncheon in the Grand Ballroom of the Airport Westin Hotel. Panache was expecting to have its 2001 Mother's Day show in the Grand Ballroom as well, but on the day of the event, Panache learned that the Westin was placing a much smaller group's bar mitzvah party in the Grand Ballroom and splitting up the Panache event between the hotel lobby and the smaller Concourse Ballroom. Determining how that allocation of

space was decided, and whether racial animus can be ascribed to that decision, requires a close examination of the documents and communications the hotel considered in making its decision.

In both 1998 and 2000, Panache signed contracts for its fashion shows with the Westin which indicated 300 projected attendees.[1] Each year, Panache increased the guarantee after signing the contract: to 397 attendees in 1998 and to 506 attendees in 2000. Although the 1998 contract specified the Grand Ballroom as the room for the event, subsequent contracts appear to follow the claimed Westin policy of not specifying function space in contracts.

On October 22, 2000, Panache faxed a letter to Renetta Williams, Senior Catering Manager of the Westin, indicating its plans to have its 2001 Mother's Day Show at the Westin, including use of "the entire ballroom" and "patio area," and asking for confirmation of numerous audition and rehearsal dates throughout the months prior to the show. On April 20, 2001, Panache sent a fax to the Westin indicating the staging requirements for the event, with handwritten notations referring to the Grand Ballroom both directly and indirectly. Apparently in response to Panache's fax, the Westin sent faxes to Panache of a diagram of a large room accommodating 670 guests, a stage, and runway; and a list of Westin rooms with the respective dimensions and capacities. The list of rooms indicates that the Grand Ballroom is the only single room that can accommodate more than 280 persons with banquet seating. The Grand Ballroom accommodates up to 900 with banquet seating and 1500 with theater seating. The next largest room, the Concourse Ballroom, accommodates 280 with banquet seating and 470 with theater seating.

On April 26, 2001, the Westin drafted a contract for the Panache event, indicating 300 expected persons to be seated

---

[1]Documents from the 1999 event are not present in the record.

at round tables of 10. The event was to generate a minimum of $6000. A deposit of $1000 was to be paid by May 2, 2001, and the remaining balance to be paid by May 10, 2001. The contract also states:

> [T]he final attendance must be received no later than 72 business hours prior to your function. . . . [I]f we have not received a guarantee by the due date, the approximate number of attendance as stated above will be used as your guarantee and you will be billed at this number or the actual number of guest [sic] served, whichever is greater.

The contract does not specify how the guarantee was to be received, beyond stating, "[f]unctions may be guaranteed for payment or paid for by company check."

Panache submitted an initial deposit of $3000 on April 30, 2001, and another deposit of $8964.68 on May 10, 2001. A handwritten note in the Westin's file on Panache, with the figure "11,964.68" written at the top and "550 gte" immediately below, and with calculations achieving that total based on number of children, adults, and costs, indicates that a new count of 550 persons and a new total cost were communicated between the parties. On May 11, Panache sent a fax to Williams further confirming arrangements for the May 13th event, including a guarantee of 550 people, as well as other details.

Meanwhile, on February 13, 2001, Westin Catering Director Patty Burns executed a contract with Neda Kermani for a Bar Mitzvah for David Kermani, on May 13, 2001, for a party of 250 persons. It was to generate a minimum of $8750, and no function space was specified. A non-refundable deposit of $1000 was due February 24, 2001, and final payment was due May 12, 2001.

On the night of Saturday, May 12, 2001, Panache arrived at the Westin to set up the event and found another group

being set up in the Grand Ballroom. The Westin's Banquet Captain, Oscar Gonzales, called the Director of Food and Beverages, Jacob Stark, to alert him of the conflict. Gonzales had tried unsuccessfully to contact Patty Burns and Renetta Williams, and then contacted Stark. Stark responded that Gonzales was to stop the set-up in the Grand Ballroom and that Stark would come in at 5:00 a.m. the next morning to address the problem.

Upon his arrival the next morning, Stark examined the files and attempted unsuccessfully to contact Williams, who had resigned. He then met with Luanna Lawrence from Panache to discuss the situation. He did not speak with anyone from the Kermani group. Thereafter, he decided that the Kermani group was entitled to the Grand Ballroom, based on the information in the contracts and internal documents, and "the fact that the Kermani group was basically set up in the ballroom already."

While meeting with Panache representatives later in the day, Stark offered three alternatives to the Grand Ballroom: (1) move the event to the Sheraton Hotel; (2) split the event so that the luncheon would be in the lobby and coffee shop, and the fashion show would be theater-style in the Concourse Ballroom; and (3) have the whole event in the lobby. Panache director, Eric Lindsey, asked if assistance would be provided for moving and redirecting guests to the Sheraton, and Stark declined. Lindsey stated that the lobby was an impossible solution because it could not seat more than 300 people, even without the stage. Therefore, after it was clear that he was not going to have the Grand Ballroom, Lindsey accepted the second option. In contrast, Stark did not offer any alternative space options to the Kermanis, whose numbers would have fit in the Concourse Ballroom.

Panache representatives testified that they had a "gut feeling" they were denied the Grand Ballroom in favor of the Bar

Mitzvah because of their race. One Panache representative described the day at the Westin as follows:

> It just felt like, to us, that our guests did not hold the same merit. We were just being placed in a location where hotel guests were in and out of our area, or the area assigned to us; there was a large group checking in and these people were roaming through the lobby looking at all of our guests. They were shuffled then — had to finish their meal quickly, were shuffled up to the second floor to attend the fashion show in theater-style seating, a room that would normally hold 300 people comfortably, they put — were going to put over 500 people in that room.

## DISCUSSION

### I. Standard of Review

We review a grant of summary judgment *de novo. Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). While viewing the facts in the light most favorable to the non-moving party, we must determine whether a genuine issue of material fact exists and "whether the district court correctly applied the relevant substantive law." *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "This Court has set a high standard for the granting of summary judgment in . . . discrimination cases . . . 'because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by a factfinder, upon a full record.' " *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (quoting *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1563 (9th Cir. 1994)).

## II.   The District Court Erroneously Decided that Panache Had Failed To Prove A *Prima Facie* Case of Discriminatory Treatment.

### A.   Elements of a *Prima Facie* Case under § 1981.

[1] In order to evaluate claims of intentional discrimination where intent itself is generally impossible to prove, courts apply a burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989), *superseded by statute on other grounds,* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. Under *McDonnell Douglas*, if the plaintiff satisfies the initial burden of establishing a *prima facie* case of racial discrimination,[2] the burden shifts to the defendant to prove it had a legitimate non-discriminatory reason for the adverse action. *Id.* at 802. If the defendant meets that burden, the plaintiff must prove that such a reason was merely a pretext for intentional discrimination. *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The proof required to establish a *prima facie* case is " 'minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

[2] How to adapt these elements established in the employment discrimination context to claims of racial discrimination

---

[2]The elements to prove a *prima facie* case of discrimination established by *McDonnell Douglas* are:

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802.

in non-employment contracts arising under 42 U.S.C. § 1981 is a matter of first impression in the Ninth Circuit. We agree with the decisions of other circuits that the first three elements of the *McDonnell Douglas* test are easily adapted to claims arising under section 1981 outside of an employment context. So adapted, the first three elements require Panache to show that: (1) it is a member of a protected class, (2) it attempted to contract for certain services, and (3) it was denied the right to contract for those services. *See Christian v. Wal-Mart Stores, Inc.*, 252 F.3d. 862, 872 (6th Cir. 2001); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 176 (7th Cir. 1996).

**[3]** However, the Seventh and Sixth Circuits conflict over adaptation of the fourth *McDonell Douglas* requirement, which, as applied by the district court here, requires that such services remained available to similarly-situated individuals who were not members of the plaintiff's protected class. The Seventh Circuit adopts this requirement, *Bratton*, 77 F.3d at 176, but the Sixth Circuit concludes that this flat requirement is too rigorous in the context of the denial of services by a commercial establishment, because customers often have no way of establishing what treatment was accorded to other customers, *Christian*, 252 F.3d at 872. The Sixth Circuit distinguishes the commercial services context from the employment context, where records are kept and there is a paper trail disclosing what treatment is given to similarly-situated others. *See id.* at 870-71. Accordingly, the Sixth Circuit alters the elements to require: "that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Id.* at 872.

**[4]** Although we find the Sixth Circuit's reasoning compelling, we need not decide today whether its modification of the fourth element of a *prima facie* case under section 1981 is

required in many or all cases arising in a commercial, non-employment context. In the case before us, as we explain below, Panache has offered clear evidence that a similarly-situated group of a different protected class was offered the contractual services which were denied to Panache. We, therefore, apply all four elements to this case without deciding whether the fourth element must be relaxed in other circumstances.

### 1. Panache is a member of a protected class.

**[5]** Eric Lindsey, C.E.O. of Panache Images, is African-American. All of the representatives of Panache are African-American. The audience members of Panache events are primarily African-American. Thus, Panache and its affiliates are identifiable members of the protected racial class of African-Americans.

### 2. Panache attempted to contract for services with the Westin Hotel.

**[6]** As described above, Panache has presented several documents establishing its attempts to contract for services with the Westin. On October 22, 2000, a representative of Panache sent a letter to Renetta Williams of the Westin to "start the confirmation process for [its] 2001 Mother's Day Show." Panache signed a contract with the Westin on April 30, 2001, for event space to accommodate 300 persons, with a set-up specifying round tables of 10. Panache faxed staging requirements with notations regarding use of the terrace and requests for dimensions of the Grand Ballroom to Ms. Williams on April 20, 2001. Panache sent a deposit of $3000 to the Westin on April 30, 2001, and another deposit of $8964.68 on May 10, 2001. Finally, Panache sent a confirmation letter to Ms. Williams on May 11, 2001, guaranteeing 550-575 people for the May 13th event.

**[7]** Based on these documents, this court disagrees with the district court's finding that "[n]othing Plaintiff produced in writing indicated that he had attempted to reserve or contract for the Grand Ballroom." (Dist. Ct.'s Order re: Def.'s Mot. for Summ. J., E.R. 152.) Panache executed a contract with the Westin for function space for 300 people with rounds of 10. The only room on the Westin's list of rooms that can accommodate 300 people seated at tables is the Grand Ballroom.[3] In addition, as described above, Panache has provided numerous written documents demonstrating its *attempts* to contract for a room at the Hotel that could accommodate at least 300 audience members for a seated luncheon and fashion show with a large stage, runway, dressing area, and terrace. Given that at least one of those documents specified the Grand Ballroom, and the undisputed fact that the Grand Ballroom is the only single room that could accommodate such an event, and the substantial testimonial evidence of Panache's intent to use the Grand Ballroom, there is enough evidence to present a triable

---

[3]We do not share the district court's seeming concern that Panache's initial conservative estimate of attendees may constitute an improper manipulation of its contractual relationship with the Westin. 300 appears to be a reasonable number for minimizing potential loss while still ensuring a large enough projection to be entitled to the Grand Ballroom, the only room which could accommodate 300, as described above. Given Panache's claims that it attempted to provide an updated count within the contracted-for provisions, Panache's prior relationship with the hotel, and Panache's alleged conversations with Ms. Williams detailing Panache's needs, and given the difficulty of projecting ticket sales and attendance for large events; Panache's use of the 300 figure does not in any way appear to constitute bad faith or improper business behavior. Rather, the fact that the contracts from 1998 and 2000 also specified 300, when the final guarantees were for 397 and 506 respectively, with no apparent complaint from the hotel, indicates that Panache's practice was acceptable to both parties. In addition, the wording of the contract does not specify any risk beyond having to pay for the true number of guests or the original number, whichever is greater, should notice not be given. Thus, when these facts are viewed in the light most favorable to the non-moving party, we find that the changed number of attendees does not implicate the *prima facie* case.

question of fact that Panache attempted to contract for the Grand Ballroom.

Furthermore, the district court erroneously focused on whether the information before Jacob Stark reflected an attempt to contract for the Grand Ballroom. In its attempts to contract with the Westin, Panache communicated with and submitted documents to Renetta Williams, a representative of the hotel. Panache should not have been expected to anticipate that the documents and communications it submitted to Williams would not be made available to all relevant decision-makers. While the information Stark was faced with does implicate the later inquiries as to legitimate non-discriminatory reason and pretext, it does not implicate Panache's attempts to contract.

### 3. Panache was denied the right to contract for services.

**[8]** It is undisputed that Panache was denied the *use* of the Grand Ballroom on May 13, 2001. Whether or not Panache was denied the *right to contract* for the Grand Ballroom requires the kind of fact-finding analysis the Ninth Circuit has recognized as basic to discrimination claims. *See Chuang*, 225 F.3d at 1124. First, there is a factual dispute as to whether Panache confirmed for 550 guests seventy-two hours in advance. Panache representative Martitia McNeel testified in her deposition that she had confirmed by telephone seventy-two hours in advance. In addition, evidence of the submission of payment seventy-two hours in advance further supports Panache's argument that it had fulfilled its contractual obligations. More important, the contract itself does not indicate that failure to provide an updated guarantee of projected guests constitutes a breach. Rather, the contract only indicates that the party would be responsible for the originally contracted count. The district court's assessment that Panache failed to confirm seventy-two hours in advance, and thus breached its

contractual obligations, ignores the existence of a substantial factual dispute.

**[9]** The district court made another impermissible factual assessment when it determined that the options offered by Stark on May 13, 2001, were equivalent to the services for which Panache had attempted to contract. In his deposition, Eric Lindsey explained how the options offered by the hotel could not have fulfilled his contractual expectations of a room for 300 to 550 guests, tables of ten and a large stage, runway, etc.; adequate time for set-up and rehearsal; and allowance for his guests to timely locate the event. Thus, Panache has presented enough evidence of its attempts to contract for a facility suitable for its particular event, and its being denied the use of such a facility, to present a genuine issue of fact as to whether it was denied the right to contract for the services sought.

### 4. The desired services were made available for the Kermani event.

**[10]** It is undisputed that the Kermani Bar Mitzvah event took place in the Grand Ballroom on May 13, 2001. It is also undisputed that a bar mitzvah is a Jewish religious ceremony. In addition, Panache representative McNeal characterized the Kermani event as a white event in her deposition. Accordingly, there appears to be at least a factual issue that the contracted-for space was made available for a group of a predominantly different racial or religious makeup from the Panache group.

**[11]** The Westin argues that the Kermanis and Panache are not similarly situated because the Kermanis booked their event earlier than Panache, as indicated by a hotel-generated booking report. We reject this argument because the record does not indicate any official hotel policy establishing a "first in time" system for prioritizing space allocation, nor is there any evidence that a contracting group would have notice of

such a policy. In addition, other forms of evidence create an issue of fact as to which group did book the space first. Because both groups attempted to contract for the same space, and a genuine issue of fact exists as to whether both parties met their contractual obligations to contract for that space, we find that Panache and the Kermanis are similarly situated at least for the purposes of establishing a *prima facie* case.

### B. The Westin Has Articulated a Legitimate Non-Discriminatory Reason for Its Decision.

Having found a triable issue of fact as to Appellant's *prima facie* case of discrimination, we proceed to the next step in *McDonnell Douglas* burden-shifting: Appellees must produce evidence of a legitimate non-discriminatory reason for allowing the Kermanis to use the Grand Ballroom sought by Panache. The Westin's burden is one of production, not persuasion, thereby involving no credibility assessment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

In their brief, Appellees articulate the following legitimate non-discriminatory reasons for Stark's decision allowing the Kermanis to use the Grand Ballroom instead of Panache: (1) the Kermanis had entered into their contract with the hotel before Panache; (2) the "booking recaps"[4] assigned the Kermanis to the Grand Ballroom and Panache to the Concourse Ballroom; (3) the Kermani event was mostly set-up in the Grand Ballroom by the time Stark arrived; and (4) Stark believed that Panache had not confirmed its total number of guests seventy-two hours prior to the event as called for by the contract.

---

[4]"Booking recaps" are documents generated by the hotel which indicate the number of attendees, space assigned, and other information regarding an event. There is no indication in the record that Panache ever saw the booking recap for its event prior to this suit.

### C. Panache Has Presented a Genuine Issue of Fact that The Westin's Non-Discriminatory Reasons Are Pretextual.

**[12]** Once a defendant presents legitimate non-discriminatory reasons, the presumption of discrimination "drops out of the picture," and the plaintiff has the new burden of proving that the proffered reasons were a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127 (citation omitted). Although the inference of discrimination created from the *prima facie* case is gone, the evidence used in its establishment may be considered for examining pretext. *Id.* (citing *Reeves*, 530 U.S. at 146-47) ("A disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."); *see also Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir. 1985), *amended by* 784 F.2d 1407 (1986) ("Once a *prima facie* case is established either by the introduction of actual evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.' " (citation omitted)).

Nevertheless, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate, even though [the] plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption." *Wallis v. J.R. Simplot Co.*, 26

F.3d 885, 890-91 (9th Cir. 1994). Most recently, in *Pottenger v. Potlatch Corp.*, we evaluated each of the plaintiff's challenges to the defendant's non-discriminatory reasons and concluded that no material issue of fact existed for each reason. 329 F.3d 740, 746-49 (9th Cir. 2003). Appellees would have us go further, citing the Supreme Court's 1993 *Hicks* decision for the proposition that simply refuting the validity of proffered legitimate reasons is not enough to create an inference of discrimination without more direct evidence of discriminatory intent.

However, Appellee's reliance on *Hicks* is misplaced. First, the *Hicks* Court evaluated a decision made by a factfinder on a complete record, 509 U.S. at 505, which requires a different analysis from that of a summary judgment motion where all factual inferences must be made in favor of the non-moving party, *Bagdadi*, 84 F.3d at 1197. Second, a subsequent Supreme Court decision clarified the *Hicks* decision and unequivocally stated that "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves*, 530 U.S. at 147. Citing the fundamental of evidence law that the presentation of evidence of falsehoods and other attacks on credibility are valuable forms of circumstantial evidence, the Court in *Reeves* held that such evidence could lead a factfinder to infer discrimination, especially when no other legitimate reason could exist for the challenged behavior. *Id.* at 147-48 (noting, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision"). Thus, the proper procedure, as clarified by *Reeves*, is to set before the factfinder the task of analyzing the entire record in order to evaluate the credibility of the reasons proffered, the possibility of other non-discriminatory reasons, and the ultimate likelihood that the main motive was discriminatory. *Id.* at 150-51.

**1.  Panache has presented genuine issues of fact for each of the Westin's proffered non-discriminatory reasons.**

**a.  Determining the relevancy of the contracts' signing dates presents a genuine issue of material fact.**

[13] The Westin's official policies and guidelines regarding function space rental do not identify the contract date as a means of prioritizing function space allotment. Stark's own explanation of his use of the signatory dates is contradictory and confusing. Although Stark stated that he had noted that the Kermani contract had been executed approximately four to five months prior to the event date, the contract is dated February 13, 2001, only three months prior; and there is no date on the space provided beneath where Neda Kermani's signature should be.[5] In addition, throughout his explanation of the impact that the contract dates had on his decision, Stark interchanged the dates of the booking recaps with those of the contracts, and never gave a basis for his use of a "first in time" prioritization in hotel policy or any other source. Indeed, Stark's proffered use of the dates on the contract for his space allocation decision conflicts with his testimony regarding the importance of other factors for the space allocation policy, such as guarantee of attendee numbers and payment. *See infra*, II.C.1.d. More important, Stark failed to indicate why the date a contract was signed would have more importance than the terms of the contract which do correlate with established hotel policy, such as number of attendees. Finally, Stark made no mention of the October 22, 2000, letter from Panache establishing the groundwork for reserving space for the May 13, 2001, event and requesting rehearsal space on numerous dates throughout the three months prior to

---

[5]The copy of the Kermani contract provided in the Excerpts of Record is cut off where the signature would be, although the empty date line is present.

the event. It is not clear whether Stark read this letter on May 13, 2001, but it appears to have been in the file.

### b.    Whether the booking recaps should form the basis for room allocation presents a genuine issue of material fact.

Stark's use of the rooms, dates, and numbers in the booking recaps to prioritize room entitlement seems somewhat credible given that the numbers are the same (250), but the dates and room assignments are different. However, Stark never contended that he exclusively used the booking recaps; and why these internal documents controlled over other documents, such as the contracts and faxes, seems to present at least a triable question of fact. For example, the factfinder may wish to consider how booking recaps are generated, whether or not they can be modified, and why they would be given importance over contracts and other documents, particularly when discrepancies existed and the contract was created after the recaps. The district court's apparent reliance on the booking recaps as proof that the Kermanis reserved the Grand Ballroom several months earlier cannot be supported by such an unclear record of the relative importance, authenticity, and accuracy of the documents. While Stark may have had a legitimate reason for using the booking recaps, "without a searching inquiry into these motives, those acting for impermissible motives could easily mask their behavior behind a complex web of *post hoc* rationalizations." *Lowe*, 775 F.2d at 1009 (citation and brackets omitted).

### c.    Whether the extent of set-up for the Kermani event warranted keeping it in the Grand Ballroom presents a genuine issue of material fact.

Stark claimed that the fact that the Kermani event was already "basically set-up" in the Grand Ballroom by the time he got there supported his decision to keep the Kermanis in the Grand Ballroom. Panache challenges this reason by noting

that all that had been set up were twenty-six tables, which were also needed for the Panache event. Panache claims that it would have been no more difficult to simply add Panache's particulars to what was already there and to set up new tables in the Concourse for the Kermanis, than it was to set up tables for Panache in the lobby and coffee shop and set up the stage/runway and theater seating in the Concourse. This argument appears compelling and should be fully presented to a fact-finder.

> **d. A genuine issue of fact exists as to the credibility of Stark's stated belief that Panache had not confirmed its total within the requisite time.**

Stark claimed that he was influenced by his belief that Panache had not confirmed its final count within seventy-two hours, and thus had not fulfilled the terms of the contract. However, there are several inconsistencies within the evidence that call the credibility of this belief into question.

First, as discussed above, Stark claimed in his declaration that he did not see the May 11 confirmation fax until after May 13. If that is true, there is no evidence to support his contention that he moved Panache because it had not confirmed seventy-two hours in advance, as the May 11 fax is the only document that suggests confirmation took place less than seventy-two hours prior to the event.

**[14]** Second, there were at least two items in the file which Stark had examined that supported an inference that confirmation had been made by May 10 and that the hotel had notice of this confirmation: (1) payment of $11,964.68 had been received by May 10, a number indicating payment for almost 600 attendees at the rate specified in the contract; and (2) a handwritten note was in the Westin's Panache file with the figure "11,964.68" written at the top and "550 gte" immediately below, and with other calculations achieving that total, such as the number of children and relative costs. While the

note is undated and unsigned, it at least supports an inference for how the total amount due was reached, why that figure was ultimately written on the checks delivered by May 10, and that the hotel had notice of those figures.

**[15]** Third, the wording of the contract does not make it clear that even if Panache had not given a guarantee seventy-two hours prior, it would have been in breach. As discussed above, according to the contract, if Panache did not guarantee a new number seventy-two hours prior, Panache would be responsible for the count specified in the contract or "the actual number of guest [sic] served, whichever is greater." Thus, from the language of the contract, Panache could have expected that its failure to update the guarantee would only result in its responsibility to pay for at least 300 persons, plus however many more were served; not that its contract would be considered breached and that the Westin would not be required to perform.

**[16]** What documents Stark actually considered and why, what those documents meant, and whether or not he examined the May 11 fax on or after May 13, are all the kinds of questions of fact best addressed by a jury. In addition, a jury could find it quite relevant that the Kermanis may not have been required to guarantee within seventy-two hours at all,[6] yet Stark claimed that Panache's failure to do so was a reason to deny it use of the Grand Ballroom.

2.  **Substantial inconsistencies throughout Stark's testimony implicate his credibility, leading to a potential inference of discrimination.**

Stark's depositions and declarations regarding his decision-

---

[6]The Kermani Contract specified that final payment was due May 12, 2001, only one day prior to the event. The top of the second page is cut off in the copies submitted to the court, so it is unclear how many hours, if any, were required for a final guarantee.

making process contain inconsistencies which call the credibility of his reasons into question. In his deposition, Stark testified that he based his decision on the contract, booking recaps, and the Banquet Event Orders ("B.E.O.").[7] At another point, he stated that Panache's B.E.O. was missing from the file at the time of his decision. He frequently interchanged the disparate information from the booking recap and Panache's contract, indicating both confusion with the documents and his having given more emphasis to an untitled internal document with a lower attendance number than that stated in the contract and which was generated before the contract was formed. For example, in providing support for his decision, Stark referred to "the fact that in the contract [Panache] had a guarantee of 250." However, Panache's contract actually stated 300, while the booking recap generated by the Westin on the Panache event stated 250.

[17] In addition, Stark gave conflicting information regarding the importance of the contract in relation to reserving function space. For example, at one point he stated that "the purpose of the guarantee in the contract is allocation, primarily allocation of space." He then explained further that once a contract is signed, catering managers

> allocate space based on the number of the guarantee. We want to maximize space obviously and allocate rooms that fit the size of the group. In other words, we don't want to have 200 people in a room that sits 1,000 or a ton of people in a room that only seats 500.

However, Stark later stated that the dollar amount controls how function space is allocated, not the minimum number of people guaranteed. Exactly what the Westin's space allocation policy is and whether or not Stark followed it, or accurately

---

[7] A B.E.O. is an internal document generated by the hotel, containing information similar to that of a booking recap.

portrayed it in conveying his reasons, present important factual and credibility assessments.

Similarly, in his signed declaration, Stark stated that he examined the May 11 fax guaranteeing 550 people after May 13, 2003, and did not list that fax with the documents he reviewed from the Panache folder on May 13, 2003. However, in his deposition, Stark testified that he discovered the fax in the file after his first meeting with Panache representatives on the morning of May 13 and that the fax influenced his decision-making because it indicated to him that Panache had not comported with its contractual obligations. These kinds of inconsistencies raise important credibility questions as to which documents Stark did examine at the relevant time and how he ultimately made his decision.

[18] Nevertheless, the most serious attack on the credibility of Stark's decision is the undisputed fact that a room other than the Grand Ballroom existed to accommodate the 250 attendees contracted for the Kermani event, seated at banquet tables, while the Grand Ballroom was the only room that could accommodate the minimum of 300 attendees contracted for the Panache event, seated at banquet tables. In addition, throughout five or six meetings with Panache representatives (and no meetings with Kermani representatives), Stark apparently refused to believe or examine further their claims that they had informed the hotel that 550 people were coming to their event, or to help those guests relocate. Stark's complete refusal to accommodate the hundreds of African-Americans arriving at the Westin in the room best able to handle them, when another room existed that could have accommodated the contracted numbers for the Kermani event, should be considered by a jury as possible evidence of racial discrimination.

### 3. The absence of direct evidence of discriminatory intent does not mandate summary judgment.

[19] As discussed above in the analysis of the Supreme Court's holding in *Reeves* in section II.C., credibility attacks

alone may provide enough circumstantial evidence to support a finding of intentional discrimination if no legitimate reasons for different treatment remain. While direct evidence of discriminatory intent, such as racial slurs, could further support such a finding, they are not required if a *prima facie* case has been established and the plaintiff presents "specific" and "substantial" "circumstantial evidence that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

[20] Here, there is specific and substantial evidence that non-African-Americans were treated differently from African-Americans. Stark testified that he never consulted with the Kermanis or offered them options other than the Grand Ballroom; yet, he claims he partially based his decision on Panache's refusal of other options. Stark apparently gave emphasis to certain documents or parts of documents in the files that favored the Kermanis, but ignored documents or parts of documents in the files that favored Panache. Stark refused to offer any assistance to Panache in relocating the event. Finally, Stark allowed a non-African-American group that could fit in another room to have the only room that the African-American group could fit in. All of this presents enough of a triable issue of fact that non-African-Americans were treated differently from African-Americans to infer discrimination, if the factfinder decides that no legitimate or credible reasons for the different treatment exist. *See Chuang*, 225 F.3d at 1127-28 (noting that disputes regarding alleged discriminator's proffered reasons and refusal to offer assistance that could mitigate effects of some of the alleged discriminatory actions presented indirect evidence of pretext).

## CONCLUSION

[21] Intentional discrimination cases such as this one present precisely the kinds of complex factual questions best

addressed by juries. After examining all of the evidence in the light most favorable to the non-moving party, we have determined that Appellant has presented evidence creating genuine issues of fact for each material inquiry in the burden-shifting analysis. Therefore, we reverse the district court's granting of summary judgment and remand for trial.

**REVERSED AND REMANDED.**